The Court is adjourned. Mr. Cornell. Thank you, Your Honor.  We have two basic claims here that summary judgment should have been denied as to each claim. The first claim is that of the Family and Medical Leave Act for taking care of her father. Now, if you look at the record, what we see is that she became eligible under the Family and Medical Leave Act in January of 2018. Now, the district judge said, well, she had signed an acknowledgment of being furnished a handbook which discussed the Family and Medical Leave Act and she would have done that approximately a year before she became eligible. The Department of Labor has issued regulation, and the regulation basically boils down to the fact that if you have an employee who has never had the opportunity to exercise family and medical leave, that it is the burden on the employer to advise them. So, where did that burden first arise? Well, I submit that it came on May the 2nd when she notified her supervisor that her father had brain cancer and was having emergency surgery. Can I ask you a quick question about the May 2nd episode? Yes, sir. I guess my understanding from the record, and you can tell me that I'm wrong, is that she actually got the leave. She didn't, though. They didn't claim it as anything. They never told her that, hey, you've got Family and Medical Leave Act. You have to remember that under the Family and Medical Leave Act, she has 12 weeks and it can be intermittent leave, and she was never told any of this. She went to Pennsylvania to take care of her father and get him through the surgery. She came back, which she wrote an affidavit under, a declaration under penalty of perjury basically saying, you know, she didn't know she had it. The district judge said, well, she signed this document when she first joined the company. But just so I understand, and this may be just too simplistic, so what's the harm to her if she in fact . . . I think they even said like, hey, you mistakenly clocked in, you should have been on leave for those four days and sort of gave it to her. What's the harm to her in interference? She had a very sick father, and it was obvious when she wrote on the 6th that she was contemplating bringing her father to South Florida and even asked this company, which is in the broadcast business. I guess, but just before we get into May 6th, just so I understand, May 2nd, I understand the father is very sick. This is a horrible situation. Yes, it is. So she says, hey, I've got to go take care of him. And in sort of in arrears, they say, leave granted. And so I'm just trying to figure out where the interference is with her FMLA rights vis-a-vis May 2, if they granted her the leave. She had 12 weeks, 12 weeks of FMLA leave that she was entitled to. Did she request 12 weeks and get denied 12 weeks? She didn't request because she wasn't told. That's part of the rights. Those are two separate claims, though, right? So just focusing on the two days, we've said that a plaintiff suffers no FMLA injury when she receives all the leaves she requests. She didn't know she would, the whole point of the notice provision is to give her an leave she would be entitled to. But you've raised two claims, right? I have. And I have an associational disability claim, which is the ADA claim. And that applies to parents. And the argument is, well, he was living in Pittsburgh. There's nothing that says under the ADA that you can't provide. In fact, our case law in this circuit says it includes emotional care. And she talked about in her declaration the fact that she spent hours on the phone from South Florida talking to her father's doctors and arranging for various things and talking to her father. These were basically, she was a caregiver. I'm not aware of any case in any circuit that says you have to be present to be a caregiver. I just don't think it's there. It's not in the language of the statute. So can I pick up on one of Judge Grant's questions about sort of moving from May 2 to May 6? Yes, Your Honor. Is the May 6 email, is there anything that even approximates a request for leave there or even an acknowledgment that leave might be relevant? I mean, it seems to me the opposite. She's not asking for leave. She's asking to keep working. She is doing, she's asking to keep working, but she's never been afforded an explanation, which she's entitled to, of her rights under the Family and Medical Leave Act. So that never happened. And she says in her declaration, had I but known. And so the mere fact that she came back, it sort of implies she didn't know she had any rights under the Family and Medical Leave Act from my perspective. Am I right in understanding the regulations? It's hard for me to figure out sort of like which events trigger which notice requirements, but am I right in understanding that these eligibility and rights and responsibilities and notices are triggered under 300 B and C, either if the employee requests leave or the employer acquires knowledge that the employee's leave might be for an FMLA qualifying reason? Is that right? And that second tick that you just discussed is where that duty arises. In the, if the employer itself acquires knowledge. Acquires notice. And you're told that someone who, a father who's, you know, taking care of a father is under the Family and Medical Leave Act. They know this. I guess the reason I'm asking is that, so I agree that the second part of that disjunction sort of helps you because it says, hey, look, she doesn't even herself have to give notice. The employer just has to kind of like have notice on its own. But it does still say that the employer acquires knowledge that an employee's leave may be for an FMLA qualifying reason. And at least with respect to May 6th, I don't even think like leave is sort of like in the discussion. Well, I think, I think that the HR department with respect to May 2nd, not May 6th, when they learned that her father had a brain tumor, cancer, that that was the time that they should have said, have we ever gone over with her what her rights are under the FMLA? And I, and the record clearly shows that they never did. And I guess, so this sort of, I hate to sort of like bring it back to the first question I asked, but Judge Grant asked some variation of the same question. So, but even if so, is the error in effect harmless because she got the leave? That wasn't all the leave she could have gotten. She had a father, you said yourself, Judge Newsom, you know, it's a horrible situation. Your father has brain cancer. He's in ICU. And you have a job in South Park. But if you get given the information that the regulations anticipate you will be given, you at least have the opportunity to say, I need more time to take care of my father. And that didn't happen. And she said that in her declaration, which he, and I apologize to the court for what I said, but I said Judge Singal, who I tried cases with when he was in state court, response was somewhat sarcastic. And I shouldn't have said that. But it was the kind of thing that you can't ignore what she says. And you go to Tolan and you go to Feliciano. I mean, she's entitled to have that evidence credited. And that's what I'm trying to say. And as regards to the associational disability claim, I just don't think there's any reason that that case, that that claim, irrespective of what happens to the FEMLA, doesn't go to a jury. I see I'm running out of time, Judge Newsom, Judge Pryor. So, I will reserve whatever I have unless you have more questions about this. I'm making noise. Thank you. Good morning and may it please the court. My name is Richard Tushman and I represent Brandstar Studios in this case. If I may, I want to focus the court's attention on what this case is ultimately about. This is a wrongful discharge case. This is a wrongful discharge case at bottom. And I want to just take the court through some of the evidence that the district court viewed. There were more than 500 pages of documents. There were notes, emails, texts, and the court reviewed all of this. So, if we go back to August 9th, 2017, for example, this is at page 63 of the appendix. Mr. Baton, who would later become Ms. Graves' supervisor, said, Jessica, you can't just decide that you are writing from home whenever you want. You should only be working from home if there are special reasons why you can't come in. You will need to come in today unless you want to take a PTO day. Can I ask you just a quick question? Sure. I understand that there were performance-related issues here, absenteeism-related issues as well. What about the bit of the regulation that I was discussing with your adversary, the second part of the disjunction, that the employer acquires knowledge that an employee's leave may be for an FMLA qualifying reason? So, it's not that she necessarily has to give notice. It's just that you kind of like have to independently have notice. And that that triggers your obligation to then get further notice of eligibility, rights, and responsibilities. Right. The employee has to say she wants leave. She doesn't have to mention the FMLA, but she has to give the employer notice that she wants leave. So, she actually herself has to open her mouth and speak it? Because the regulation says either the employee requests leave or the employer acquires knowledge that an employee's leave may be for an FMLA qualifying reason. The operative word being leave. Okay. So, it's not your contention that she has to speak it into existence, but that the employer might come by this knowledge independently, but that the knowledge nonetheless has to pertain to leave. It has to pertain to leave, exactly. And in fact, if we go back to May 2nd, even that didn't put the employer on notice of a request for FMLA leave for a couple of reasons. One, as you noted, Your Honor, she clocked in on those days. And she testified that she worked remotely at times. And the record is clear on that. So, the employer... Right. She said something like, I will not be available for calls and edits. Right. I mean, that might be, I don't know, some partial request for leave or something. Yeah. It might be. But then you couple that with the fact that she actually clocked in. And she testified that if Kayla, the woman in HR, had seen that she clocked in, she would have had no reason to know that Jessica Graves needed FMLA leave. She clocked in. And to your point earlier, Your Honor, she got that leave. She got the two days. Not only did she get the leave, but she was paid for it. It was ultimately designated as PTO. So, what about his response to my suggestion that, hey, what's the big deal? She got the leave. He says, well, sure, she got a few days. But what she didn't get was notice that she might be entitled to a lot more. Right. And she testified that she didn't want more. And that's clear from the record. Jessica Graves testified, to my surprise, given the nature of the claim here, that she did not want leave when she returned from Pennsylvania. She wanted to continue working. Her deposition testimony was clear on this point. So, not only did she not request leave when she came back from Pennsylvania, but she didn't want leave. The May 6th email, as you noted, Your Honor, is a request that she borrow the construction guys to do a military makeover episode. It was a pitch to the company president. It was not a request for leave. So, she got the leave she requested, and she didn't want more leave. And Mr. Cornell's argument is, well, the employer should divine somehow that the employee may want leave and put an employee on notice that she's eligible for FMLA leave, even if she doesn't say she wants it. The regulations and the case law create no such obligation. If I may, I want to refocus, though, the court's attention on what this case is ultimately about. Because at the end of the day, if there is no harm to the plaintiff in not getting the leave that she was allegedly entitled to, and to be clear, our position is she was not entitled to FMLA leave. But ultimately, if there was no harm, then there's no foul. The case law is clear on that. And what was the harm to Ms. Graves? She can't show any, because she was not terminated because she missed work due to FMLA leave that she claimed she was denied. She was terminated because of all the other absences that preceded this episode where her father got sick in Pennsylvania. And that's why I started to read the record evidence, because it starts back in 2017 and continues in August of 2017, where Mr. Baton says, Hi, Jessica, thank you for letting me know that you left today, but I would really appreciate it if you would tell me you were leaving early before you actually leave to make sure everything is covered, and I'm okay with it. That's at page 70. I'm not going to read the entire email. I just want to give you a flavor. In February of 2018, there's a negative feedback note from Mr. Baton. Jessica is constantly coming into work late. In the last two weeks, she comes in after 9.30 a.m., 10 out of 14 days. In the month of January, she came in after 9.30 a.m., 17 out of 23 days. The same day, there's a negative feedback note from Aaron Baton. It's actually an email. Good evening, Jessica. Since we were not able to connect today and meet with Arash, her other supervisor, I wanted to send you my concerns and see if we can resolve it. My main concern, and we've talked about this several times since I moved over to the Director of Operations role, is your attendance. In November, Arash and I spoke to you about coming in late and leaving early, and the team was noticing it. It got better for a few months, but we are now back to the same routine again. I've looked over your IPS attendance, and in the past two weeks alone you've come into work at 9.30 or later, 10 out of 14 days, and he goes on. Then there's another, that was February 2018. This is all well before her father gets ill in Pennsylvania. March 14, 2018, Aaron Baton, I'm still having issues with Jessica. She is very hard to work with and is always combative when you talk to her and does not show me any respect. She wants everyone to adhere to her schedule and does not take into account other people's schedules. This mainly involves edits. She does not come to edits prepared and therefore is constantly asking for more edit time. All of the editors have expressed their lack of enthusiasm working with her because she does not come with a proper edit or script. Arash and I have spoken to her several times about this and many other issues, as she has not gotten better. Her work is fair at best, and I feel she is not giving it a roll. She comes and goes as she pleases, which is fine if all her work is done, but it's not. He goes on to say, she is just very difficult to work with and I'm not sure how we can make this work any longer. Again, this is months before her father becomes ill. Fast forward to May 10, 2018. Arash, the other supervisor, says, I had a sit-down with Jessica today as we were having some challenges with editors who feel like they were not getting the support from Jessica they need. Mainly because she does not come prepared to her edit sessions. We also discussed how this is a pattern and that it cannot keep going on continuously. And he goes on. May 16, 2018. Got a text from Jessica to me and Arash at 5.28 p.m. saying she will be working from home the next day. Arash and I did not respond and she took the day to work from home anyway. Then later on the day, on 5.16, she texted me that she was at a doctor's appointment for a torn meniscus. Nothing to do with her father. 5.18. Jessica had a shoot today in the studio, which ended at 3 p.m. Right after the shoot, I saw her leave for the day without asking Arash or I if it was okay to leave early. She has edits lined up for the next couple of weeks and could have used this time to EDL, which is part of the editing process. Instead, she chose to leave early. 5.24. Jessica texted me last minute saying she won't be in until 10.45 because she had a doctor's appointment. Not related to her father. This is her own doctor's appointment. Can I ask you another question about the regulations? Sure. I hate to interrupt the flow of your narrative, but can you, and this is confusion maybe in my own mind from having read the district court's order. The district court's order seems to get sort of, seems to dive into whether this was like a foreseeable episode, an unforeseeable episode. Tell me if I'm wrong about this. As I read the regulations, those content of notice specifications in 302 and 303, those don't apply to the initial sort of notice, if you will, from employee to employer about the, you know, sort of an FMLA qualifying episode, but instead to the subsequent notice from employee to employer that like I intend to take it. Is that right? Do I have that right? In that respect, is the district court's order confused? It may be a little confusing in the sense that I think whether it was foreseeable or non-foreseeable is a red herring. It's irrelevant right here. I agree with that because at the end of the day, what the record is clear on is that Ms. Graves got the initial notice of the FMLA and its policy. She gets the employee handbook and she acknowledges that. Now it's incumbent, if she actually wants to take leave, it's incumbent upon the employee to put the employer on notice. And there are regulations, as you noted, as to whether leave is foreseeable or not foreseeable. But at the end of the day, it is kind of a red herring because she didn't put the employer on notice that she needed FMLA leave during this relevant time period when she comes back on May 6th. And frankly, it's our position that even on May 2nd she didn't because all she did is say, my dad is in ICU, I'm going to see him. Not only did she clock in then, but we cited a couple of cases for the proposition that just going to the hospital to see a parent is not care under the FMLA. There's no indication in there that she needed to care for him. So even that... There's no magic words requirement, right? She doesn't have to say, I need two days of FMLA leave to take care of my father, right? Correct. She doesn't need to utter the words FMLA, Family Medical Leave Act. She does need to ask for leave. She needs to ask for leave for... And it has to be evident to the employer that it's for an FMLA-qualifying reason. Now, caring for a parent, caring for a parent can be an FMLA-qualifying reason, but if you look at the Second Circuit decision we cited, even just going to the hospital to see a parent is not enough. But again, even if you disagree with that, with the Second Circuit's decision, and you say, OK, she gave the employer enough information to put Brandstar on notice that she needed FMLA for those two days. As Judge Newsom noted, she got the FMLA leave. She was, in fact, paid for it. She was not punished in any way for taking that FMLA leave. That's why I was taking the court through the record, because it is very clear that none of these absences had anything to do with her father. In fact, if I may, just going back to the record, in her deposition, I said, Ms. Graves, we have looked at numerous documents in which Aaron was counseling you about not arriving to work on time, correct? And I don't want to, in the interest of time, I'll skip through. And I said, OK, but on none of those occasions we've looked at up to this point in time, did your absence from the physical building have anything to do with your father, correct? Not at that time, because I was getting ready to move him down with me, and that was what was coming up. So she's looking forward and speculating, really, that her father coming down to Florida in the future had something to do with her termination, when the record evidence is clear that all the events that occurred in the past, for the last nine months, events that had nothing to do with her father's illness were the basis for her termination. Was that the term of her employment? Was she there for nine months, or did it begin sooner than that? No, she started in January of 2017, but she had a different supervisor, Jason Gagnon, for the first 11 months. In November of 2017, Mr. Baton became her supervisor, and that's when things changed for her, because Mr. Baton was more demanding. Not because of her father, to be clear, but because he was just a more demanding supervisor, which she admitted. So she admitted that none of these incidents that led to her termination had anything to do with her father. That's why, even if you parse the regulations and say, well, maybe, theoretically, Brandstar had an obligation to put her on FMLA notice on... give her FMLA notice on May 2nd, at the end of the day, this had nothing to do with her termination. So she can't... There's no strict liability requirement for FMLA notice, right? It's not as if an employer gets some kind of penalty for not providing notice, if the employee doesn't actually suffer some sort of penalty. Yeah, the 11th Circuit case law is clear that if there is no harm to the plaintiff, the failure to give notice is not actionable, and that's exactly... Even if there was a duty to give notice, which, again, we contend there wasn't, there was no harm to the plaintiff arising from that because she was terminated for legitimate reasons. And as I know, I'm running short on time, but just to end, the first thing the district court says in its discussion is this. In the instant motion, defendant argues it is entitled to summary judgment because plaintiff's termination was unrelated to her father's illness. Defendant argues plaintiff had a long history of being counseled by her supervisors, Baton and Farsi, for poor communication and attendance, not completing her work, being unprepared, and being disrespectful. There is no evidence to suggest otherwise despite plaintiff's claims to the contrary. And the judge drops a footnote. The arguments on summary judgment include over 500 pages of exhibits and depositions. Furthermore, plaintiff's speculation is insufficient to defeat summary judgment. So ultimately, that's what the court's ruling was premised on. The clear and really undisputed evidence that she was terminated for all of these performance reasons that had nothing whatsoever to do with her father. Thank you. Thank you, Mr. Tushman. I think it's interesting to note that there seems to be somewhat of a confusion about who made the termination decision. Termination decision was made by Mr. Alfieri, not by anyone else. And Mr. Alfieri has testified that he thought her work was very, very good. And Mr. Alfieri also tried to let Mr., not Mr. Gagnon, but the other gentleman, lay off of her. So just because one supervisor thought she was doing a lousy job, we've got Gagnon and we've got Alfieri saying she was great. She's got an Emmy for some Philadelphia show she was the manager of. With respect to, there's another aspect. What did Mr. Alfieri offer her? He offered her a contract that would take her out of the Family and Medical Leave Act and out of the ADA. Now, I don't quite know why he would do that, but it's at least susceptible to the inference that they wanted to avoid what we're here on, and that is the potential liability under both the FEMLA or associational disability. I think that the employer needs to argue these things to a jury and that the district judge sort of went over the top. This rule, judge, you said there's no consequence. Of course, there's a consequence if you breach a duty under the Family and Medical Leave Act, and that is you're not entitled to avoid being sued when you had an affirmative duty that you skipped. Well, I guess I just want to make sure that I've got this clear because as Judge Grant has pointed out, our cases say that absent some harm or injury, there's no cognizable claim. So it seems like there are two things. One, she got the leave with respect to May 2, right? Your response was... She was entitled to much more. She was entitled to more. His counter response is she said she didn't want any more. So what's your counter counter response to the counter response? Well, it's sort of... I don't quite know how to counter the counter, but what I think is if somebody is... The employer is presumed to know what the law is. It's just the obligation of the employer under the FEMLA. And my client has submitted a declaration under penalty of perjury that she would have acted differently had she but known. And that's the kind of thing that juries decide. And that's my argument is that he just went there. With respect to the associational discrimination, I never heard my friend, Mr. Margulis, argue before you today that she couldn't be a caregiver because she was in Florida. You can be a caregiver anywhere. And in our cases in this circuit, say it can be emotional support. And clearly when she's testifying and putting in her affidavit or declaration of what she's doing with her father, that is something that a jury can decide. And if Mr. Margulis at trial wants to say, well, didn't you say on page 12 whatever, that's fine. That's what our juries do. And unless there's any more questions, I've got 25 seconds. And I appreciate the time you've given both Mr. Margulis and myself. Thank you.